RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0094p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-5122

MAURICIO GIVENS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:09-cr-20064-1—Jon Phipps McCalla, District Judge.

Decided and Filed: May 15, 2015

Before: BOGGS, SILER, and CLAY, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** Paul L. Nelson, FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Carroll L. Andre III, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

BOGGS, J., delivered the opinion of the court in which SILER, J., joined. CLAY, J. (pp. 6–11), delivered a separate dissenting opinion.

_____

### OPINION

_____

BOGGS, Circuit Judge. On December 7, 2010, Defendant-Appellant Mauricio Givens pled guilty to bank fraud. On April 4, 2011, the court sentenced Givens to 18 months of imprisonment and four years of supervised release. On July 14, 2011, Givens was released and

1

his supervised release began.  In November 2013, Givens's probation officer petitioned the court to revoke his supervised release.  The officer claimed that Givens attempted to drive his car into Steven Queen.  During the revocation-of-release hearing that followed this petition, Givens sought to impeach Queen on the basis of hearsay evidence.  The district court refused to admit that evidence and subsequently revoked Givens's supervised release.  Givens timely appealed.  We affirm the judgment of the district court for the reasons that follow.

"The [district] court may, after considering [certain factors] . . . revoke a term of supervised release, . . . if the court . . . finds by a preponderance of the evidence that the defendant violated a condition of supervised release . . . ."  18 U.S.C. § 3583(e)(3).  Such district-court revocations of supervised release are discretionary.  This court reviews those revocations for an abuse of discretion.  *See, e.g.*, *United States v. Stephenson*, 928 F.2d 728, 731-2 (6th Cir. 1991); see *also N.L.R.B. v. Guernsey-Muskingum Elec. Co-op., Inc.*, 285 F.2d 8, 11 (6th Cir. 1960) (defining an abuse of discretion as "arbitrary action not justifiable in view of" the situation and circumstances affecting the individual case).

Because we review a decision to revoke a prisoner's release for an abuse of discretion, this case does not turn on whether Queen testified accurately that Givens assaulted him.  Rather, it turns on whether or not the district court was within its discretion to exclude evidence that might have called Queen's testimony into question.  In particular, Givens attacks the district court's exclusion of two reports about Queen: "a police report, and the follow-up Secret Service [report] of Mr. Queen."  According to Givens's counsel, the report "talk[ed] about how [Queen has] tried to intimidate people," but the court, looking at the report, concluded that it was a report that a church pastor had called the police to tell them that one of his members said that Queen had harassed her; because it was "just a bunch of hearsay," the court refused to let Givens use it as impeachment material.  Givens's counsel did cross-examine Queen without that report.  One question Givens's counsel asked was whether Queen had "ever been charged with harassing anyone" other than Givens.

Our task is to determine whether there was *any* justification for the district court to exclude the hearsay evidence that purportedly concerned Queen's reliability as a complaining witness.  There was, as a brief review of the relevant doctrinal history will show.

Prior to 1970, it was not clear that the Constitution demanded *any* trial process in administrative proceedings.  In *Goldberg v. Kelly*, 397 U.S. 254 (1970), the Supreme Court applied "the template for adjudication provided by the Federal Rules . . . *in some respects* to the administrative context."  Judith Resnik, *For Owen M. Fiss: Some Reflections on the Triumph and the Death of Adjudication*, 58 U. Miami L. Rev. 173, 179 (2003) (emphasis added).  Despite the costs to the government, *Goldberg* and its sequellae afforded a non-zero but less-than-trial amount of process to participants in administrative proceedings.

The revocation of parole is an administrative proceeding, and the Court applied *Goldberg* to it.  *Morrissey v. Brewer*, 408 U.S. 471, 487 (1972).  This court, in turn, applied *Morrissey* to revocation-of-supervised-release cases.  *United States v. Lowenstein*, 108 F.3d 80, 85 (6th Cir. 1997).  The *Morrissey* Court clarified "the minimum requirements of due process," including (a) written notice, (b) disclosure of evidence, (c) opportunity to be heard in person and to present evidence, "(d) the right to confront and cross-examine adverse witnesses (*unless the hearing officer specifically finds good cause for not allowing confrontation*)," (e) a neutral and detached arbiter, and "(f) a written statement by the factfinders  as to the evidence relied on and reasons for" revocation.  *Morrissey*, 408 U.S. at 489 (emphasis added).

Because *Goldberg* does not turn every administrative process into a full trial, *Morrissey* does not entitle convicts to the full panoply of process due to a criminal accused of a crime in the first instance.  *Morrissey*, 408 U.S. at 489 ("[T]here is no thought to equate . . . revocation to a criminal prosecution in any sense.").  Rather, the idea of *Morrissey* was to provide *some* process to the would-be prisoner while keeping the cost to the government of such process lower than that of the process due at trial to the accused.  The *Morrissey* Court emphasized that it had "not thought to create an inflexible structure for parole revocation procedures."  *Id.* at 490.  Such an inflexible structure would too little respect the government's legitimate interest in efficiently revoking the supervised release of convicts who had violated the terms on which their release was conditioned.

To mandate that judges presiding over revocation-of-release hearings allow hearsay evidence that might tend to impeach government witnesses would be to extend *Morrissey* beyond all recognition.  In other words, Givens was not due a revocation-of-release process *as*

defendant-friendly as a process due to criminals before convictions, let alone a process *more* defendant-friendly.

This historical background shows that *Morrissey* and its sequellae do not require a judge to admit hearsay evidence in a revocation-of-release setting. Although hearsay is admissible under certain conditions, *see, e.g.*, *United States v. Waters*, 158 F.3d 933, 940-41 (6th Cir. 1998)), the court is not *obliged* to admit such evidence. And the rationale for excluding hearsay from trial suggests why a court, in its discretion, might exclude hearsay from an administrative hearing, too. For one thing, hearsay is unreliable, almost by definition. The court might not consider evidence that it considers more likely to obscure than to develop facts. For another, common intuition reveals that "the events that we know firsthand (that is, of our own personal knowledge) are fewer than those of which we have secondhand knowledge (that is, we know of them only through hearsay)." 30 Wright & Graham, Fed. Prac. & Proc.: Evid. § 6321 at 7 (1997). From this logical rule follows a legal one: courts exclude most hearsay from trials. So, "[t]he power over the admission and exclusion of hearsay is a substantial weapon in the trial judge's arsenal. . . . [I]f hearsay were freely admissible, the number of potential witnesses in a lawsuit and the amount of testimony each could give would expand dramatically." *Ibid*.

As a structural matter, the court might not consider evidence that slows the proceeding, either concerned for judicial economy (this is the rationale, for example, for the rule of evidence that a litigant cannot introduce extrinsic evidence on a collateral matter only for the purpose of contradicting a witness) or for government interests (interests recognized by *Goldberg* and *Morrissey*).

We can distinguish our cases that seem to hold otherwise. In *United States v. Kokoski*, 435 F. App'x 472 (6th Cir. 2011), the district court revoked the defendant's supervised release and relied, in part, on professional records about him. After opining that the records were, in fact, exceptions from the hearsay exclusions because they were business records, we observed that their admission did not prejudice the defendant and so did not constitute reversible error. *Ibid.* Other revocation-of-release apparently hostile to the exclusion of hearsay evidence *affirm* district-court revocations of release. *See, e.g.*, *United States v. Kirby*, 418 F.3d 621 (6th Cir. 2005), *United States v. Shakir*, 574 F. App'x 712 (6th Cir. 2014), *United States v. Dobson*,

529 F. App'x 536 (6th Cir. 2013), *United States v. Thompson*, 314 F. App'x 797 (6th Cir. 2008), and *United States v. Shipman*, 215 F.3d 1328 (6th Cir. 2000) (table).   Here, Givens, not the government, sought to introduce the alleged hearsay.   We affirm the judgment of the district court.

Givens also claims that there was insufficient evidence to revoke his release.   The government needed to prove violation of supervised-release terms only by a preponderance of the evidence.   It was within the discretion of a district court to consider Queen's testimony—whether or not the proceedings included the hearsay evidence possibly undermining Queen's credibility—sufficient evidence that Givens assaulted Queen.

In short, district courts may or must exclude most hearsay evidence from trials.   Although revocation-of-release hearings need not follow the inflexible procedural rules of trials, the flexibility of administrative-hearing procedures, such as those for revoking release, makes following the hearsay rules a safe harbor—not required, but virtually always an appropriate exercise of discretion.

In this case, Queen's testimony may not have been as reliable as Givens's—but that was an evidentiary argument for the adjudicator to consider.   *See Taylor v. United States Parole Comm'n*, 734 F.2d 1152, 1155 (6th Cir. 1984) ("Our concern in this case is with the paucity of reliable evidence of petitioner's criminal conduct and not with the hearsay nature of the evidence which was presented.").   The district court did consider the relative trustworthiness of the witness and other sources of evidence, and so fulfilled its statutory and constitutional mandate. For the foregoing reasons, we affirm the judgment of the district court.

—————————

**DISSENT**

—————————

CLAY, Circuit Judge, dissenting. This case is not about an individual on supervised release seeking the "full panoply" of due process rights afforded to a criminal defendant; nor is it about the broad discretion commanded by a district judge in determining whether to revoke supervised release. I concur in the majority's views on both of those points. However, because Givens' revocation sentence was determined by a charge that is not sustainable on the limited evidence before the court and because the district judge mistook the law in this case, I respectfully dissent.

## I.      Factual Background

A more detailed review of the facts is necessary to illustrate why I view this case differently from the majority. Givens' revocation hearing was initiated due to three distinct charges, only one of which he now disputes—an aggravated assault for allegedly driving his car at another individual. This charge subjected Givens to a substantially higher sentence of imprisonment. The only evidence to support this allegation is the account of Givens' accuser, Steven Queen. These are the undisputed facts. Givens was driving down the street in Queen's neighborhood affixing to each mailbox a flyer for his business. Queen flagged Givens down to inform him, incorrectly, that Givens' actions were in violation of the local homeowners' association rules. Givens initially contended that he had all the appropriate permits to be advertising his business, but he eventually relented in trying to convince Queen and drove away. Queen immediately began taking photographs with his cellphone of Givens' car as Givens departed, and he continued taking photographs until Givens' car had rounded a bend and was no longer in sight. Queen intended to inform the police about Givens' activities and provide them with the photographs he had taken.

At this point, their stories diverge. Givens testified that he circled back in his car so that he could affix flyers to mailboxes on the opposite side of the street. When he came back around the bend, he testified, Queen was in the street continuing to take photographs and blocking his

path.  Givens admitted that he ultimately got out of his car to confront Queen, at which point he threatened Queen, gesticulating with his hands and arms and saying that Queen needed to stop taking photographs because Givens just wanted to be left alone.  Queen, on the other hand, testified that he dropped one of Givens' flyers in the middle of the street (which he intended to take to the authorities), and when he bent over to try to retrieve the flyer, Givens' car violently barreled toward him, forcing him to dive out of the way and into his neighbor's yard.  Queen explained that Givens jumped out of his car, began throwing punches, took his phone, and deleted all but one photograph before throwing the phone back at his feet.  This photograph, which was introduced as evidence to support the lesser-included charge of assault, shows Givens' arm reaching out in the direction of Queen's cellphone.

Queen suffers from paranoia as the result of his post-traumatic stress disorder that arose following his military service.  At the hearing, the prosecution disclosed what it thought was potential impeachment evidence that could be used for Givens' defense.  This evidence included a harassment complaint filed against Queen by the pastor at a local church that he had formerly attended with his now-estranged wife and a report made by the United States Secret Service in response to Queen lodging a frivolous complaint, where ultimately, agents demanded that Queen "not go around saying that people were being investigated by the Secret Service."  (R. 149, Revocation Hr., PageID # 319).  The district court concluded that this evidence could not be used to impeach Queen because it was not a conviction, stating that a supervisee facing revocation "typically can't ask about other conduct like that" because it is "just a bunch of hearsay."  (*Id.* at 300, 302).  The district judge was implicitly referring to Rule 608(b), which bars the use of extrinsic evidence to attack a witness' character for truthfulness.[1]

The district judge weighed the evidence and found that the photograph showing Givens' arm reaching out toward the cell phone "support[ed] the proposition that [Givens] grabbed the phone," and therefore committed an assault.  (*Id.* at 351–52).  The district judge also surmised that Givens' display of anger in a phone call that related to one of the other charges "suggests that he has a got a very short fuse," which further supported Queen's claim.  (*Id.* at 353).  With respect to the aggravated assault, he found that "[b]ecause the defendant is generally discredited

---

[1]The exception to Rule 608(b) is 609, which provides for the admission of criminal convictions.

and Mr. Queen's testimony is credible in the case by a preponderance of the evidence, I would also find that [Givens] did attempt to strike [Queen] with the vehicle." (*Id.* at 355). The district judge did not explicitly explain why Givens' testimony was discredited and there is no proof on record of Givens having testified dishonestly.[2] Notably, Queen's testimony did contain certain inconsistencies, which the district judge excused because "[Queen] didn't volunteer for posttraumatic stress disorder." (*Id.* at 353).

## II.      Legal Analysis

This fact pattern presents two issues that combine to result in a revocation of supervised release based on a proceeding that failed to meet the minimum standards of due process. These issues are the insufficiency of the government's evidence and the district judge's legally erroneous exclusion of admissible hearsay, which only served to highlight the weakness of the government's case with respect to the aggravated assault charge levied against Givens.

A district court, within its discretion, may revoke a defendant's supervised release upon a finding by a preponderance of the evidence that a defendant has violated the terms of his release. *United States v. Stephenson*, 928 F.2d 728, 733 (6th Cir. 1991). This judgment must be based, however, on sufficient, reliable evidence. *Id.* The district judge, relying on Queen's word alone, found that Givens committed an aggravated assault while driving his car by attempting to run Queen down. The problem with the district judge's conclusion is that Queen's testimony, on its face, is incredible, inconsistent, and not supported by any corroborating evidence. Even the majority concedes that "Queen's testimony may not have been as reliable as Givens's." Maj Op. at 5. Unlike the majority, however, I would not afford deference to the district judge in this instance, because no deference is due if the witness' testimony is facially implausible, "contradicted by extrinsic evidence," or "internally inconsistent." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985).

---

[2]The district judge, earlier in the hearing, did suggest that Givens falsely denied calling his grandmother to ask that she urge his girlfriend to lie to the authorities regarding his alleged domestic assault. But this denial is not false; Givens did not deny the call, just the prosecution's interpretation of what he was telling his grandmother to do. From Givens' perspective, he was merely asking his grandmother to urge that his girlfriend recant her version of events, inasmuch as Givens maintains that elbowing her was the accidental result of trying to restrain her with one arm, as they were engaged in animated argument while Givens was driving.

Queen admitted that he intended to report Givens to the police based on Givens' lawful activities prior to any alleged assault. Queen stated at the hearing that he reported to the police this alleged assault on the day that it occurred, when in fact he did not lodge his complaint with the police until two months later. Queen testified that he was wounded by the alleged assault and that the police had taken photographs of the wounds, yet there is no such record of any photographs in the police report. Moreover, Queen could not explain why he initially chose to harass Givens, when confronted with the fact that Queen was not aware of any ordinance that would have actually prohibited Givens' activity.

These patent contradictions in Queen's testimony that bear on his credibility, along with the absence of evidence to corroborate his allegation that Givens tried to run him down, magnify the significance of Givens' inability to present evidence for the purpose of further impeaching Queen. The majority asserts that "Givens was not due a revocation-of-release process *as* defendant-friendly as a process due to criminals before convictions, let alone a process *more* defendant-friendly." Maj. Op. at 3–4. However, no one has suggested a proposition that is contrary to that assertion. What Givens was due is a level playing field. As highlighted in the majority's own opinion, due process at a revocation hearing must include "the right to confront and cross-examine adverse witnesses (*unless the hearing officer specifically finds good cause for not allowing confrontation*)." *Morrissey v. Brewer*, 408 U.S. 471, 487 (1972); *United States v. Lowenstein*, 108 F.3d 80, 85 (6th Cir. 1997). Moreover, due process is not satisfied by merely offering a supervisee the ability to engage in a perfunctory examination of an adverse witness, because "effective cross-examination" is too "vital a constitutional right," *Davis v. Alaska*, 415 U.S. 308, 320 (1974), which cannot be limited to the extent that a supervisee is prevented from presenting relevant evidence that bears on the credibility of a government witness. *Cf. United States v. Garrett*, 542 F.2d 23, 25 (6th Cir. 1976).

The federal rules of evidence do not apply to revocation of supervised release proceedings. Fed. R. Evid. 1001(d)(3). Therefore, hearsay evidence is admissible at the discretion of a district judge so long as it is relevant and reliable. *See, e.g., United States v. Kirby*, 418 F.3d 621, 628 (6th Cir. 2010). Hearsay evidence that would qualify for an exception to the hearsay rule at trial under the federal rules is deemed presumptively reliable. *United*

*States v. Waters*, 158 F.3d 933, 940 (6th Cir. 1998).  The Secret Service report falls squarely within this category of presumptively reliable documents as a public record, because it contained a memorialization of the agency's actual knowledge and awareness that Queen had been falsely telling people that they were under investigation by the Secret Service.**[3]** *See Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994) ("It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted . . . .").

Although the district judge was not obligated to admit the report—for example, he may have found good cause for its exclusion—he was obligated to know and apply the correct standard for the admission of Givens' impeachment evidence before he chose to reject it.  Instead of considering either reports' relevance or reliability, he inappropriately relied on the rules of evidence, which do not apply, and remarked that both reports were inadmissible simply because they were hearsay and not convictions.  That is not the law.  And absent any application of the correct legal standard, it is incongruous to suggest that the district judge specifically found "good cause," as required by *Morrissey,* for denying the accused the right to confront with all relevant evidence the sole witness against him, whose testimony accounts for the only evidence of the alleged vehicular assault.  Givens should have been afforded the opportunity to meaningfully confront an admittedly paranoid individual with impeachment evidence, showing that individual's penchant for harassing people and fabricating complaints.

The majority insinuates that the district judge's failure to comport with the applicable law of this Circuit is unimportant because government hearsay can be treated more favorably than hearsay offered by a supervisee.  But that too is plainly wrong.  Due process does not allow a district judge to apply one evidentiary standard for the government and another for the accused.  Any such circumstance, which for the supervisee is akin to entering a fight with one hand tied behind his back, is fundamentally unfair and inconsistent with any notion of due process.  The district judge may have found good cause for excluding the report, but he failed to indicate it.  Because this standard presumes that a district judge will freely exercise his or her discretion within appropriate bounds, the majority's concern with a potential glut of hearsay impeachment

---

**[3]**The police complaint lodged by Queen's former pastor would not be presumptively reliable.

is completely unfounded. If the proffered evidence is not proved to be reliable *and* relevant it will appropriately be excluded.

This case would not be a matter of concern if Queen's testimony were not so flawed, or if there was additional evidence to support his claims. And any error might be harmless if Givens was already subject to the same punishment for his other violations of supervised release. But that was not the case. Without the finding that Givens attempted to commit a vehicular assault, his guidelines range would be only 6 to 12 months, far less than the 30-month sentence ultimately imposed as a result of the district judge's patently flawed finding that Givens attempted to run Queen down with his car. Queen suffers from post-traumatic stress disorder and was admittedly paranoid. Although the district judge is correct that those limitations are not Queen's fault, justice cannot be served by simply ignoring those limitations and subjecting a supervisee to an additional term of prison based solely on the incredible and inconsistent testimony of a complaining witness who suffers from paranoia. Because there is insufficient evidence, even by a preponderance of the evidence standard, to support a finding that Givens attempted to commit a vehicular assault, I would remand this case to the district court where Givens could be resentenced without the aggravated assault charge.